FILED
NOV 9 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL CASE NO.** 07-247 |
| | : | |
| **v.** | : | **VIOLATIONS: 18 U.S.C. § 371** |
| | : | **(Conspiracy)** |
| **DANA E. MARSHALL** | : | |
| | : | |
| **Defendant.** | : | |

**STATEMENT OF OFFENSE**

Pursuant to Fed. R. Crim. P. 11, the government, through its undersigned counsel, and defendant Dane E. Marshall, advised by his undersigned counsel, Elise Haldane, stipulate and agree that:

1. In or about October, 2006, defendant Sheri F. Adams ("ADAMS") began picking up packages and currency from individuals and delivering them to DANA E. MARSHALL ("MARSHALL"). In or about October, 2006, ADAMS met MARSHALL for the first time in the Safeway at Hechinger Mall.

2. ADAMS learned that MARSHALL was employed by the District of Columbia as a correctional officer for the District of Columbia Department of Corrections ("DCDOC") in Washington, D.C., that MARSHALL was assigned to the Central Detention Facility ("CDF"), sometimes referred to as the D.C. Jail, located at 1901 D Street, SE, Washington, D.C., and that MARSHALL primarily worked in the culinary area of the CDF.

3. MARSHALL primarily worked in the culinary area of the CDF and was responsible for enforcing the established rules of the CDF. One of those rules prohibited bringing contraband into or possessing contraband in the CDF including, but not limited to, cash and tobacco. MARSHALL had been trained regarding the contraband prohibition. MARSHALL and ADAMS knew that

bringing contraband into the CDF, possessing contraband in the CDF and giving contraband to an inmate in the CDF was in violation of MARSHALL's official duty as a correctional officer.

4. Between October, 2006, and August, 2007, ADAMS would receive calls from individuals associated with inmates at the CDF who would arrange to deliver cash and/or contraband to her. She would then deliver cash to MARSHALL. During this time, ADAMS made a delivery to MARSHALL from time to time, and on one occasion there were no deliveries for a period of two to four weeks because MARSHALL told ADAMS that they need to "shut down".

5. Every delivery from ADAMS to MARSHALL included cash or cigarettes.

6. MARSHALL and ADAMS agreed to split the bribery payments "50/50".

7. MARSHALL told ADAMS that he concealed the items of contraband on his person and/or in his belongings and/or in items he was carrying. MARSHALL would bring the contraband into the CDF, wherein MARSHALL would deliver the contraband to the inmates who requested the item, or to other inmates who would then further distribute the contraband to the intended recipient.

8. In or about July, 2007, MARSHALL met with an inmate in the CDF who, unbeknownst to MARSHALL, was a cooperating witness ("CW1") working with the Federal Bureau of Investigation ("FBI"). MARSHALL agreed to bring cigarettes and cash into the CDF for CW1. CW1 told MARSHALL about his contact outside the CDF, who was actually an FBI Undercover Employee ("UCE"). MARSHALL instructed CW1 to call ADAMS to arrange for the delivery to her. CW1 obtained ADAMS' phone number from another inmate.

9. On July 24, 2007, a person who identified himself as "Gil" contacted ADAMS via her cellphone. During the call, Gil and ADAMS discussed the process by which Gil could set up and pay for the smuggling of contraband to an inmate in the CDF. ADAMS listed for Gil the services

offered as well as the prices for those services. For example, when asked how much she charged for various items, ADAMS replied "candy 200, cigarettes, a carton 200, and a cell phone is 250." "Candy" was slang for controlled substances. ADAMS told Gil that the inmate in the jail would get the cigarettes two days after they met and payment was made.

10. On July 27, 2007, Gil and ADAMS spoke via telephone. During the call, Gil and ADAMS negotiated the amount of the bribe that ADAMS and MARSHALL would be paid for smuggling cigarettes and cash to the inmate. Gil asked ADAMS to smuggle in $100 in cash to the inmate, in addition to a carton of cigarettes. ADAMS responded that she normally charged an extra $50 for smuggling cash, but offered to charge only $25 after Gil complained that he was not advised about an additional charge to smuggle cash into the CDF.

11. On July 31, 2007, Gil and ADAMS spoke via telephone. During the call, Gil and ADAMS made plans to meet to complete the transaction on August 2, 2007.

12. On August 2, 2007, Gil and ADAMS met in the parking lot of McDonald's at the intersection of New York Avenue and First Street NE, Washington, DC. During the meeting, Gil provided to ADAMS $325 in cash in the following denominations: six $50 bills, one $20 bill, and one $5 bill. Of the money provided to ADAMS, $225 was to be used to purchase a carton of cigarettes that would be delivered to an inmate in the CDF, with the remainder of the money (approximately $180, depending on the exact cost of the cigarettes) serving as a bribe for MARSHALL and ADAMS. The bribe was in return for ADAMS and MARSHALL delivering $100 in cash and a carton of cigarettes to an inmate in the CDF. ADAMS later delivered the money to MARSHALL. On August 6, 2007, MARSHALL delivered 10 packs of cigarettes and two $50 bills to CW1 inside the CDF.

13. On August 17, 2007, Gil and ADAMS met in the parking lot of McDonald's at the intersection of New York Avenue and First Street in Northeast Washington, DC. During the meeting, Gil provided to ADAMS one $50 bill, a 32" LCD television that was still in its original packaging, and an Ipod Nano. Gil advised ADAMS that the television set was stolen property. The $50 and LCD television set were a bribe payment for ADAMS to share with MARSHALL for smuggling the Ipod and a carton of cigarettes in to an inmate in the CDF. ADAMS told Gil that she was keeping the television set for herself.

14. After meeting with Gil, ADAMS returned to her residence at 601 Edgewood Street NE. There, she met with MARSHALL. MARSHALL unloaded the LCD television, still in its original packaging, from ADAMS' car. MARSHALL carried the television set up the ramp and into ADAMS' apartment building, while ADAMS walked beside him.

15. During the conspiracy, ADAMS wrote down information concerning the pick-ups she had made or had agreed to make, including inmates' names, their cellblock, and the item(s) to be smuggled into the CDF.

16. MARSHALL also wrote down information about the transactions.

17. During the execution of a search warrant at MARSHALL's residence in Triangle, Virginia, contemporaneous with his arrest, numerous items of contraband packaged for smuggling into the CDF were found in MARSHALL's possession, including, but not limited to cigarettes, lighters, rolling papers, cellphones and controlled substances.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA

By: ______________________
Thomas J. Hibarger
Assistant United States Attorney
555 4th Street, N.W.,
Washington, D.C. 20530
(202) 514-7385
Bar Number 413224

**DEFENDANT'S ACCEPTANCE**

I have read every word of this Statement of Offense. Pursuant to Fed. R. Crim. P. 11, after consulting with my attorney, Elise Haldane, I agree and stipulate to this Statement of Offense with regard to every action taken by me. With regard to facts in the Statement of Offense of which I have no personal knowledge, after receiving information from the government, I state that I have no reason to refute the facts contained in this proffer.

Date: 9 Nov 07

DANA E. MARSHALL
Defendant

I have discussed this Statement of Offense with my client DANA E. MARSHALL. I concur with his decision to stipulate to this Statement of Offense.

Date: November 9, 2007

Elise Haldane
Attorney for the Defendant